UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

  UNITED STATES OF AMERICA

                                           :

       - v. -

                                           :      17 Cr. 680 (CM)

  MICHAEL WRIGHT,

                                           :

              Defendant.

                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# THE GOVERNMENT'S SENTENCING MEMORANDUM


 

                                           GEOFFREY S. BERMAN
                                           United States Attorney for
                                           the Southern District of New York

Brendan F. Quigley
Elisha J. Kobre
Assistant United States Attorneys
   - Of Counsel

The Government makes this submission in advance of the sentencing of Michael Wright ("Wright" or "the defendant"), which is scheduled for Thursday, March 7, 2019.  In the plea agreement, the parties stipulated that the applicable Guidelines range is 21 to 27 months' imprisonment.  The Probation Department agrees with that calculation.  As set forth below, the Government submits that a sentence within that range, along with forfeiture and restitution, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Wright participated in a scheme to defraud investors in a ticket business he operated together with Craig Carton and Joseph Meli by misappropriating $2 million in investor funds for his own and Carton's personal use.  In furtherance of the scheme, Wright opened a bank account, for which he alone had signatory authority, and provided the account information to Carton as a means to divert the funds.  Once received, Wright disbursed nearly the entire $2 million investment to a variety of personal expenses, including approximately $250,000 to repay a personal loan, $690,000 to repay a gambling loan he had guaranteed for Carton, and nearly $1 million to Carton's personal account, much of which was ultimately directed to casinos.  Wright's participation in the fraud, while less substantial than Carton's, was nonetheless fully knowing, serious, and brazen.

The Court should reject Wright's risible attempt to obtain leniency on the ground that he is allegedly indispensable to a Manhattan-based strip club where he is employed.  Wright's absence will not threaten the viability of the strip club (which is in the process of opening a third location), nor does he possess any unique skills such that only he can operate the strip club.  This case therefore presents nothing like the "extraordinary" circumstances of *Milikowsky*.

Accordingly, a Guidelines sentence is necessary to reflect the seriousness of the offense, provide just punishment, and general and specific deterrence.

## BACKGROUND

### I. The Fraudulent Scheme

From at least in or about August 2016 through at least in or about January 2017, Wright participated in a calculated, closely-planned, multi-million dollar scheme, with co-conspirators Carton and Meli, to defraud investors in a purported ticket business the three claimed to operate.

Wright was a full, knowing participant in the scheme. Wright controlled, and was the sole signatory, on a bank account in the name of Tier One Tickets, one of the principal entities used by Carton and Wright to receive fraudulently-obtained investor proceeds. Wright was willingly represented to investors as the Chief Financial Officer of Tier One Tickets. And Wright diverted nearly $2 million in investor proceeds, among other places, to his own personal use, to Carton's personal bank account, and to repay Carton's gambling loan to Desmond Finger.

As the evidence showed at trial, in or about the fall of 2016, Wright, Carton, and Meli discussed substantial debts they had and how they could use funds from investors in a ticket business to repay these debts. The debts included money Carton owed to casinos for gambling excursions and gambling loans to individuals like Harvey Klein and Desmond Finger, loans which Wright had solicited on Carton's behalf and had personally guaranteed. The debt was sufficiently substantial and pressing that, in an e-mail Wright sent to Carton listing options for re-paying the debt, Wright included "Run to Costa Rica, change name, and start life all over again – may not be an option." (GX 224).

Instead, Wright, together with Carton and Meli, turned to fraud. By early December 2016, Carton was nearing completion of his negotiations with a large New York based hedge fund (the "Hedge Fund," as identified in the Indictment) for a $10 million revolving loan, the proceeds of which were to be used exclusively for the purchase of bulk tickets to particular live events for

resale at a profit.  In a text message on December 6, 2016, Meli expressly proposed to both Wright

and Carton misappropriating the Hedge Fund's loan "to repay debts":

> *We use [the Hedge Fund] money to repay debts.*  Where do
> we get the money to buy tickets and further more what deal
> do we offer the money provider for the tickets? We can not
> pay [Hedge Fund] with other people's money right away
> because it does not work. *We need [Hedge Fund] to buy
> deals with long lead times and earn money in the interim and
> use the earned money to replace the [Hedge Fund] funds in
> ticket deals on the future.* That is the math we have to figure
> out and work it into a schedule to get down to zero [.]

(GX 54 (emphasis added)).

Carton responded, copying Wright, explicitly agreeing to misappropriate the Hedge Fund's

money.  In the days following this exchange, Carton sent the Hedge Fund multiple fraudulent

written agreements purporting to give entities controlled by Carton and Meli the right to purchase

hard-to-come-by bulk tickets to popular live events.  Among these fraudulent contracts was one

purporting to be between Carton's company, Ticket Jones, and a sports and entertainment company

(the "Sports and Entertainment Company," as identified in the Indictment).  Pursuant to this

purported agreement (the "Ticket Jones Contract"), the Sports and Entertainment Company gave

Ticket Jones, among other things, the right to purchase $2 million worth of tickets to concerts by

specific performers at one of the venues operated by the Sports and Entertainment Company.  As

demonstrated at trial, the Ticket Jones Contract was fraudulent and, indeed, contained a forged

signature of the Chief Executive Officer of the Sports and Entertainment Company.

Wright directly participated in misappropriating the Hedge Fund's $2 million investment

pursuant to the Ticket Jones Contract.  In particular, on December 18, 2016, the night before the

Hedge Fund wired its $2 million investment to the Sports and Entertainment Company as directed

by Carton, Wright e-mailed Carton wire routing information for an account in the name Tier One

Tickets, the entity owned jointly by Carton and Wright utilized to commit the fraud (the "Tier One

Tickets Account").  Wright had sole signatory authority over the Tier One Tickets Account. Wright provided Carton with this wire information in anticipation of their scheme to misappropriate the $2 million the Hedge Fund was going to wire to the Sports and Entertainment Company the next day for the purchase of tickets.

The following day, December 19, 2016, unbeknownst to the Hedge Fund, and even before the Hedge Fund's $2 million wire arrived, Carton contacted the Sports and Entertainment Company, falsely stated that the wire had been sent in error, and directed that the wire be rerouted to the Tier One Tickets Account controlled by Wright.  The Sports and Entertainment Company complied with this request, sending the $2 million per the account information Wright had provided to Carton.

Once the Hedge Fund's investment was received in the Tier One Tickets Account, Wright misappropriated nearly the entire investment.  In particular, Wright immediately transferred $966,000 of these funds to an account he controlled, from which he subsequently utilized approximately $250,000 to pay down his own personal home equity line of credit and $690,000 to pay off a gambling loan Wright had solicited for Carton from Desmond Finger, and which Wright had personally guaranteed.  As to the remainder of the Hedge Fund's $2 million investment, Wright spent approximately $40,000 on various personal retail items and to pay off his credit card and transferred approximately a total of approximately $950,000 to Carton's personal bank account (much of which Carton used to repay debts to casinos).

Notably, Wright even lied to Carton and Meli, his partners in crime, for the purpose of obtaining more of the Hedge Fund's investment.  In particular, Wright transferred $966,000 of the Hedge Fund's investment to his own account based upon his false representation, in an earlier e-mail, that Desmond Finger's group was owed that amount.  (GX 248).  In reality, however, Finger

was owed only $690,000.  As noted above, Wright used the remainder of the money to repay his personal home equity line of credit.

## II.        The Guidelines Calculation

Both the parties and the Probation Office calculate the Guidelines as 21 to 27 months' imprisonment.  The base offense level is 7, pursuant to U.S.S.G §2B1.1(a)(1).

Wright is responsible for approximately $1,389,310 in losses.  This figure represents the Hedge Fund's $2 million investment pursuant to the fraudulent Ticket Jones Contract – which was intended for tickets to concerts at a venue operated by the Sports and Entertainment Company – less $619,689.99 which Carton repaid to the Hedge Fund before the fraud was discovered.[1] Accordingly, because the offense involved more than $550,000 but less than $1,500,000 in loss, 14 levels are added, pursuant to U.S.S.G. §2B1.1(b)(1)(H).

Two levels are subtracted, pursuant to U.S.S.G. §3B1.2(b) because Wright was a minor participant in the criminal activity.

Subtracting three offense levels for acceptance of responsibility pursuant to U.S.S.G § 3E1.1 yields a total offense level of 16.  Together with Criminal History Category I, this yields a Guidelines range of 21 to 27 months' imprisonment.

---

[1] *See* U.S.S.G. § 2B1.1, App. Note (3)(E)(i) ("Loss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.").

5

## DISCUSSION

### I.  The Court Should Impose a Guidelines Sentence

The Court should impose a Guidelines sentence.  Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

### A.  The Nature and Circumstances of the Offense, and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment Require a Guidelines Sentence

*First*, a Guidelines sentence is appropriate in light of "the nature and circumstances of the offense," and the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   18 U.S.C. § 3553(a)(1)-(2).

The offense conduct here was extremely serious.  Wright worked with Carton and Meli to defraud the Hedge Fund out of $2 million.  Wright's participation – by providing Carton with the wire information needed to misappropriate the investment funds, receiving those funds in an account solely controlled by Wright, and then disbursing the funds for his own and Carton's personal use – was necessary for the scheme to succeed.

While Wright's role in the scheme was less substantial than Carton's — a circumstance for which Wright has already received credit in the form of a two-level minor role reduction under the Guidelines — he was nonetheless a fully knowing participant.  It is simply not credible to state, as Wright does, that he was less than fully aware that he was not entitled to use the Hedge Fund's investment to repay Carton's gambling debt and to pay his own personal expenses.  (Def. Br., at 9).  For one thing, Wright is a sophisticated businessman, having served for nearly a decade as Chief Operating Officer and prior to that Vice President of Marketing for a large Manhattan business.  By his own admission, Wright has "extensive experience running businesses." (Def.

6

Mem. at 4).  Wright knew that a large, sophisticated hedge fund such as the Hedge Fund was not giving Carton money to repay gambling debts or for Wright to pay off his own debts.

Moreover, on October 26, 2016, Carton forwarded Wright a term sheet outlining the terms of the Hedge Fund's investment, which specifically stated, in a section titled "Use of Proceeds" that the investment was to be used "to purchase tickets."  In addition, while Wright did not personally interact with Hedge Fund personnel in soliciting the Hedge Fund's investment, he well knew that the Hedge Fund sent its $2 million investment not to Carton directly or to a Carton entity, but rather directly to the source of the tickets – i.e., the Sports and Entertainment Company. Indeed, it was from that entity that Wright received the funds, not from the Hedge Fund.  Given Wright's knowledge that the funds had been sent directly to the source of the tickets, it is inconceivable that Wright believed that there was "no[] limit[] in his use of those funds." (Def. Br. at 9).

Finally, Wright is simply wrong to state that, "[b]y the fall of 2016, Mr. Wright had concluded that the Advance Entertainment deals did not concern him."   (Def. Br. at 8).  While Wright is not responsible for the fraud relating to investments in tickets which were purportedly to be obtained by Advance Entertainment, he was nonetheless directly involved in diverting those investor funds for Carton's personal use.   For example, on September 12, 2016, days after one victim-investor transferred his $1 million investment, which Carton promised would be used exclusively to purchase tickets to concerts by *Adele*, $900,000 of those funds were transferred into an account jointly held by Carton and Wright.  Within the next two days, almost all of these funds were disbursed to various casinos and for other of Carton's personal expenses.  (GX 2004, 2305).

Likewise, Wright was the sole signatory on an account in the name AdvanceM Ltd., an entity used to misappropriate another investment by the Hedge Fund of $700,000.  That investment

was to be used exclusively for the purchase of tickets to concerts promoted by a large company in the business of promoting concerts (the "Concert Promotion Company," as identified in the Indictment).  The day after the Hedge Fund transferred this investment to Advance Entertainment's bank account on December 8, 2016, the money was transferred to the AdvanceM account.  Days later, on December 12, 2016, Wright transferred $500,000 to repay Carton's gambling debt to Harvey Klein (which Wright had personally guaranteed) and $200,000 to Carton's personal account.  (GX 2306).

The facts moreover directly contradict Wright's assertion that he participated in the fraud because he was "misled" by Carton or because he was too "busy in his work" at a strip club where he is employed as chief operating officer (the "Strip Club") to realize that he was participating in a fraud (Def. Mem., at 8-9).  For one thing, Wright has provided no evidence of the alleged conversation in which Carton purportedly told Wright that Carton was "not limited" in how he could use the Hedge Fund's investment.  To the contrary, Wright's communications with Carton and Meli show that he knew the funds were to be used to purchase tickets.  And Wright was apparently not too "busy" with his work at the Strip Club to carry on intensive e-mail and text message communications with Meli and Carton about the ticket scheme, open bank accounts to further the scheme, or conduct multiple wire transfers of investor funds.  Wright was not too busy to realize this was a fraud.

In his submission, Wright also implausibly asserts, as late as spring or early summer of 2017, to have been "confused" about why Carton was "scrambling to repay debts" and claims that he believed Carton was a victim of Meli's.  (Def. Mem. at 9-10).  But the evidence offered at trial shows that this is untrue.  In particular, on May 19, 2017, Wright was copied on an e-mail Carton sent to yet another victim-investor – to whom Carton introduced Wright as the CFO of Tier One

8

Tickets – containing a series of blatant lies. (GX 1107). In this e-mail, for example, Carton falsely told this victim that the $2 million wire from the Sports and Entertainment Company to Tier One Tickets was thereafter returned to some original "private individual[]" investors: "We sent $966k to one investor and then Craig sent a total of $700k . . . to another investor . . ." (*Id.*).

As Wright well knew, these were lies. The $2 million was not used to repay ticket investors, but rather to pay off Wright's own line of credit; to repay gambling loans Wright had solicited for Carton; and to fill Carton's personal account. Indeed, contrary to Carton's representation, there were no original "private individual" investors; the money was simply misappropriated from the Hedge Fund. Notably, Carton sent Wright a draft of this false narrative before forwarding it to the victim.[2] Wright was no dupe.

## B. A Guidelines Sentence Is Necessary for General and Specific Deterrence, and to Protect the Public

*Second*, a Guidelines sentence is necessary for general and specific deterrence and to protect public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A).

As to specific deterrence and the need to protect the public from further crimes of the defendant, it is notable that this was not a crime borne out of poverty or a result of a difficult family situation. To the contrary, Wright is a person of substantial means and had a "stable upbringing." (PSR, at 29). His willingness to allow greed to guide his conduct suggests that a sentence within the applicable Guidelines range is necessary to ensure that he does not repeat it yet again.

General deterrence is also crucial. As the Court is aware, this case has received substantial media attention. The Court's sentence will undoubtedly send an important message to the public.

---

[2] Produced at USAO_Carton-Wright_10_00002198.

Respectfully, the Government submits that the message should be that all those engaged in fraud will receive serious punishment.

### C.  The Court Should Reject Wright's Remaining Arguments

The Court should reject Wright's remaining arguments regarding the § 3553(a) factors.

*First*, the Court should reject Wright's arguments that his history and characteristics militate towards a below-Guidelines sentence.  While Wright's strong work ethic and industriousness are laudable, they do not mitigate the seriousness of his crimes or the necessity for specific and general deterrence.  To the contrary, those positive traits are particularly harmful and destructive when used, as Wright did here, in furtherance of a fraudulent scheme.  Nor does Wright's alleged effort to operate the Strip Club in a law abiding and ethical manner provide a basis for leniency.  Wright should not receive bonus points for staying within the law in one area while at the same time engaging in fraud.

*Second*, the Court should reject Wright's argument that a variance is appropriate because of the alleged impact his absence will have on the Strip Club.  The circumstances here are far from the "extraordinary effects" relied upon in *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995).

As an initial matter, the Second Circuit has repeatedly recognized that "the business effects of a white collar offender's incarceration generally provide no ground for departure."  *Milikowsky*, 65 F.3d at 7 (2d Cir. 1995); *United States v. Khan*, 94 F. App'x 33, 38-39 (2d Cir. 2004) (vacating and remanding sentence that improperly included a departure for the defendant's business circumstances because there was no evidence that the defendant "has unique skills essential to this enterprise, or that his two partners could not hire a new manager or do the work themselves"); *United States v. Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006) (vacating and remanding sentence; "The record does not support the district court's finding that a term of imprisonment would cause

Rattoballi's business to 'absolutely end'; neither Rattoballi nor his business partner predicted such an outcome.").

While *Milikowsky* affirmed a departure based upon "extraordinary effects" on the defendant's business, this case presents no such circumstances.  In *Milikowsky*, the defendant was "the only individual" who could run one company; "necessary to ensure the continuing viability of" another company; and both companies were in an "extremely precarious financial condition." *Id.*  The district court there found that "the companies' continuing livelihood depends entirely on [the defendant's] personal involvement" and that, in the defendant's absence, both companies might well go into "immediate bankruptcy." *Id.* at *9-10.

Here, to the contrary, Wright does not allege that he is "the only person" who can operate the Strip Club or that he is necessary to ensure the business's "viability."  There is no evidence that Wright has some unique skill such that only he can operate the Strip Club or that in his absence the club might go out of business.  To the contrary, even on the letters submitted,[3] Wright's absence would at most result in a 20% reduction in revenue.   (Def. Mem. at 26).  Indeed, the financial condition of the Strip Club is apparently sufficiently strong that it is in the process of building a new, third location.  Unlike the "extraordinary" circumstances of *Milikowsky*, the Strip Club is not in danger of "immediate bankruptcy."  *See Khan*, 94 F. App'x at 38-39 (departure requires that the defendant has "unique skills essential to this enterprise"); *Rattoballi*, 452 F.3d at 136 (departure inappropriate because no evidence that the business would "absolutely end").

---

[3] Wright has not submitted any financial records from the Strip Club in support of his claim that his absence would have a detrimental financial impact on the club.

## II.        The Court Should Impose Forfeiture

The Court should also impose forfeiture, in the form of a money judgment for $346,128, representing the amount of proceeds traceable to the commission of the offense, as Wright agreed to in his plea agreement.

The forfeiture statute pertaining to securities fraud broadly provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation."  18 U.S.C. § 981(a)(1)(C).

In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may obtain a money judgment against the defendant to recover the amount of the defendant's crime proceeds.  *E.g.*, *United States* v. *Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (a forfeiture order may include a money judgment for the amount of money involved in an offense; the money judgment acts as a lien against the defendant personally for the duration of his prison term and beyond).

The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses.  *See, e.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (defendant convicted of food stamp fraud was properly-sentenced to a forfeiture money judgment equal to the entire loss amount paid by the government, without subtracting the amount of cash that the defendant shared with the food stamp beneficiary;  "Because the statute [18 U.S.C. § 981(a)(2)(A)] directs that 'proceeds' are not limited to net profits from the crime, and because any proceeds directly traceable to food stamp fraud are subject to forfeiture, the district court did not commit error by entering a forfeiture order equal to the entire loss amount."); *United States* v. *Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme.");

12

A money judgment is appropriate even if the defendant did not retain the proceeds of his crime or does not have the resources to pay the money judgment. *United States* v. *Awad*, No. 06 Cr. 600 (DLC), 2007 WL 3120907, at *4-5 (S.D.N.Y. Oct. 24, 2007) ("Where a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment against the defendant is effectively an in personam judgment in the amount of the forfeiture order.").

Accordingly, the Court should impose a money judgment for $346,128, representing the gross proceeds Wright received from his participation in the scheme as set forth in the plea agreement.

**III.     Restitution**

The Court should also order restitution in the amount of $1,614,542.51.

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Wright's offenses were committed by fraud or deceit. See 18 U.S.C. § 3663A(c)(1)(A)(ii).   The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court."   18 U.S.C. § 3664(f)(1)(A)*; see United States* v. *Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

The Government bears the burden of demonstrating the loss amount sustained by the victim because of the offense.  18 U.S.C. § 3664(e).  Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence.  *Id.* "Findings of the amount of loss may be based upon reasonable estimates." *United States* v. *Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).

Here, the Court should order restitution as set forth on the Proposed Restitution Order and Schedule of Victims to be submitted prior to sentencing.  As discussed above, Wright is

responsible in restitution to the Hedge Fund for its December 19, 2016 $2 million investment, less a repayment by Carton to the Hedge Fund of $619,689.99, plus $234,232.50 to reimburse the Hedge Fund's legal fees incurred during participation in the investigation and prosecution of the offense and attendance at proceedings related to the offense.  *See* 18 U. S. C. §3663A(b)(4).  This totals to $1,614,542.51.

## CONCLUSION

For the reasons set forth above, the Court should impose a Guidelines sentence and order

forfeiture and restitution.

Dated:  New York, New York
        February 28, 2019

                            Respectfully submitted,

                            GEOFFREY S. BERMAN
                            United States Attorney
                            for the Southern District of New York

                    By:     _____/s/_____
                            Brendan F. Quigley
                            Elisha J. Kobre
                            Assistant United States Attorneys
                            Tel.:  (212) 637-2190/2599

15